IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No. 1:18-cr-00046-YK-1 |
| v. | : | |
| | : | (Judge Kane) |
| HENRY MORALES, JR., | : | |
| Defendant | : | |

**MEMORANDUM**

Before the Court is Defendant Henry Morales, Jr. ("Defendant")'s motion for suppression of physical evidence and statements pursuant to the Fourth Amendment to the United States Constitution. (Doc. No. 55.) For the reasons stated herein, the Court will deny Defendant's motion.

**I.  BACKGROUND**

On September 13, 2018, the Court conducted a hearing on Defendant's motion to suppress. (Doc. No. 55.) At that hearing, the Government offered the testimony of Special Agent Ryan Kovach ("Special Agent Kovach"), and Special Agent Jamie Markovchick ("Special Agent Markovchick"), of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), as to the events surrounding the search of a residence located at 325 Charles Road in Lancaster, Pennsylvania (the "Home") on January 18, 2018. Defendant offered the testimony of his partner, Natasha Parrish ("Ms. Parrish"); himself; and Special Agent LaToya Stewart ("Special Agent Stewart"), of the ATF.

**A.  Factual Background[1]**

---

[1] The following background is based upon the testimony given by various witnesses at the hearing before the Court on September 13, 2018 and the exhibits offered during that hearing. The testimony offered during the hearing conflicts as to multiple factual details. When conflicting testimony exists, the Court has noted such conflicts herein. The Court credits the consistent testimony of Special Agents Stewart, Kovach, and Markovchick. See, e.g., United States v. Leveto, 343 F. Supp.2d 434, 442 (W.D. Pa. 2004) ("It is settled that at a hearing on a

### 1. Burglaries on the Night of January 16-17, 2018 and Initial Investigation

On the night of January 16, 2018, into the early morning hours of January 17, 2018, a gun shop in Palmyra, Pennsylvania and a pharmacy in Lebanon, Pennsylvania were burglarized. (Tr. at 20: 4-8; 44: 19-23.) Multiple firearms were taken during the burglary of the gun shop. (Id. at 6: 15-19; 33: 21-23.) As a result, police arrested two individuals, Jorge Santiago ("Santiago") and Fernando Rodriguez ("Rodriguez"), on the night of the burglaries.[2] (Id. at 20: 9-18.) Surveillance footage obtained by police indicated that multiple individuals wearing dark sweatshirts, hats, and gloves were present at the scenes of the burglaries. (Id. at 52: 23-25; 53: 1-2.) At the time of their arrests, Santiago and Rodriguez were wearing clothing that officers identified from the surveillance footage. (Id. at 21: 18-21.)

### 2. ATF Investigation on January 18, 2018

On January 18, 2018, Special Agents Stewart and Kovach were investigating the burglaries, with Special Agent Stewart acting as the lead agent for the investigation. (Id. at 23: 4-6, 12-14; 88: 8-9.) They had spoken to witnesses who identified Defendant as someone involved in the burglaries. (Id. at 22: 11-12.) Special Agent Stewart then used several search

---

motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." (citations and quotations omitted)). Based on the consistency of their testimony and their investigative experience (Tr. at 4: 24-25; 5: 1; 44: 17-18; 88: 6-9), where testimony conflicts, the Court finds the testimony of Special Agents Stewart, Kovach, and Markovchick credible. The Court also notes that in addition to conflicting with the testimony of Special Agents Stewart, Kovach, and Markovchick, Defendant's testimony also contradicts that of his partner, Ms. Parrish, at times. Additionally, the Court notes that Ms. Parrish admitted that she had difficulty hearing due to deafness in one ear, and implied that her view from the kitchen into the living room area, where much of the encounter between the ATF Agents and Defendant occurred, was obscured. (Id. at 61: 10-13; 63: 5-7.)

[2] Two other individuals, Ronald Grover and a juvenile, were also eventually arrested in connection with the burglaries. (Id. at 24: 4-7; 40: 12-16, 18-25; 41: 1-4.)

methods to identify an address at which to find Defendant. She first used a Pennsylvania Department of Transportation ("PennDOT") driver's license search. (Id. at 90: 18-25; 91: 1-5.) The results page of the PennDOT search listed Defendant's address as 325 Charles Road in Lancaster, Pennsylvania. (Id. at 88: 10-21; Doc. No. 100 at 6.) Special Agent Stewart also performed a search through Accurint, a program that examines multiple forms of public records to identify addresses associated with a specific name. (Tr. at 97: 5-25.) The Accurint search report indicated several addresses associated with Defendant, the most recent of which was 325 Charles Road in Lancaster, Pennsylvania. (Id. at 92: 1-3; Doc. No. 100 at 3, 7.)

At some point before 8:00 PM, Special Agents Stewart, Kovach, and O'Donnell traveled to the residence of Ronald Grover and interviewed his sister, Ronisha Grover, whose vehicle the agents believed was involved in the burglaries. (Tr. at 23: 19-25; 24: 1, 12-22.) During that interview, Ronisha Grover gave her consent to the ATF agents to search her vehicle by signing ATF Form 3220.11, a consent-to-search form. (Doc. No. 100 at 2.) By the evening of January 18, 2018, the ATF agents had a working list of which firearms taken during the gun shop burglary had been recovered and which firearms remained unaccounted for. (Tr. at 54: 2-7.) Approximately three guns, at least some of which were handguns, remained missing at that point. (Id. at 6: 15-19; 54: 2-7.)

### 3. 325 Charles Road in Lancaster, Pennsylvania

Ms. Parrish, Defendant's partner, resides at 325 Charles Road in Lancaster, Pennsylvania. The Home is a single-story residence with three bedrooms, a living room area, a kitchen and dining room area, and a basement. (Id. at 8: 13-17; 9: 4-8; 15: 23-25; 16: 1-2; 71: 22-23.) Ms. Parrish's brother owns the Home and rents the Home to their mother. (Id. at 65: 17-

3

25.) At the time of the burglaries and investigation in January 2018, Ms. Parrish's mother and two children also lived at the Home. (Id. at 71: 17-21.)

When Defendant, who was employed at a Taco Bell restaurant at the time of the search, had to work a morning shift, he would stay at the Home the night before, but he mainly lived at the homes of his mother and grandmother. (Id. at 51: 17-20; 66: 5-10; 72: 10-17.) Defendant shared a bedroom with Ms. Parrish on the nights that he stayed at the Home. (Id. at 9: 15-17.) Ms. Parrish allowed Defendant to keep a basket of clothing in the bedroom but did not permit him to have his own dresser drawer. (Id. at 73: 5-16.) As to whether Defendant could store his belongings in the bedroom, Ms. Parrish had told Defendant, "Don't get too comfortable." (Id. at 73: 5-12.) On the night of January 18, 2018, Defendant was at the Home and intended to spend the night there because he was scheduled to work the next morning. (Id. at 72: 10-21.)

### 4. Interview and Search at the Home on January 18, 2018

On the night of January 18, 2018, Special Agents Stewart, Kovach, Markovchick, and O'Donnell (all four collectively referred to as the "ATF Agents") arrived at the Home at approximately 8:00 PM in plain clothes, but also wearing ATF ballistic vests and carrying firearms, with the purpose of interviewing Defendant. (Id. at 6: 20-22; 45: 1-24.) The ATF Agents did not draw their firearms at any point on the night of the search, but Special Agent Markovchick had an AR-15 rifle slung on his shoulder.[3] (Id. at 29: 15-21; 30: 1-3; 45: 21-24; 55: 4-7; 64: 2-6.) Special Agents Stewart and Kovach approached the front door of the Home, while Special Agents Markovchick and O'Donnell went to another door on the side of the Home. (Id. at 26: 19-24; 46: 9-11.) Special Agent Kovach knocked on the door, which Defendant

---

[3] Special Agent Markovchick testified that he was carrying the AR-15 and the ATF agents were wearing the ballistic vests because they assumed that the individuals they were speaking with in connection to the gun shop burglary could possibly have the firearms that were unaccounted for at that point. (Id. at 45: 25; 46: 1-5.)

4

eventually opened.[4] (Id. at 6: 25; 7: 1-2.) Special Agents Stewart and Kovach identified themselves, and Defendant told them to come inside.[5] (Id. at 7: 11-12; 46: 8-12, 25; 47: 1-3.) Special Agent Kovach motioned to Special Agents Markovchick and O'Donnell to come through the front door, and the ATF Agents then entered the Home and followed Defendant to the living room area, where he sat down on a couch without being prompted to do so by any of the ATF Agents.[6] (Id. at 7: 14-25; 8: 1-3; 28: 13-23; 29: 3-11; 47: 5-12.)

In the living room area, the ATF Agents then told Defendant that he was a suspect in the burglaries and advised him that he was not under arrest. (Id. at 8: 5-8; 31: 21-24; 47: 17-20.) Defendant responded by denying any knowledge of or involvement in the burglaries. (Id. at 8: 8-9.) After several minutes, Ms. Parrish entered the living room area from the hallway where the bedrooms were located. (Id. at 8: 10-14; 47: 13-16; 93: 10-16.) Special Agents Stewart and Markovchick went to the kitchen and dining room area to speak with Ms. Parrish, (id. at 8: 14-

---

[4] The relevant testimony conflicts as to who first answered the door. Defendant and Ms. Parrish testified that Ms. Parrish's eight-year-old nephew first opened the door, and then Defendant went to the door and spoke with Special Agents Stewart and Kovach. (Id. at 59: 8-16; 75: 7-11.) Special Agents Kovach and Markovchick testified that Defendant answered the door. (Id. at 6: 25; 7: 1-2; 27: 11-17; 47: 2-3.) The Court credits the testimony of Special Agents Kovach and Markovchick, but notes that all of the pertinent testimony given at the hearing indicates that Defendant was the first adult to go to the door and speak with the ATF Agents.

[5] The Court notes that Defendant testified that Special Agent Markovchick was the first ATF agent at the door. (Id. at 75: 22-25; 76: 1-4.) However, the Court credits the testimony of Special Agents Kovach and Markovchick, which indicates that Special Agents Stewart and Kovach were at the door when Defendant opened it. (Id. at 6: 25; 7: 1; 46: 9-11.) The Court also notes that Defendant testified that he asked Ms. Parrish whether to allow the ATF Agents to come inside, and that she told him to let them in because it was cold outside. (Id. at 77: 14-16.) However, the testimony of Ms. Parrish and Special Agent Kovach indicates that this exchange did not occur. (Id. at 7: 11-12; 59: 12-25; 60: 1.) The Court credits the testimony of Ms. Parrish and Special Agent Kovach, which indicates that Defendant allowed the ATF Agents to come inside without consulting with Ms. Parrish.

[6] Defendant testified that Special Agent Markovchick told him to sit on the couch. (Id. at 77: 23-24; 78: 1-4.) However, the Court credits the testimony of Special Agent Kovach, which indicates that Defendant sat on the couch without being told to do so. (Id. at 28: 19-23.)

17), while Special Agents Kovach and O'Donnell remained in the living room area with Defendant (id. at 8: 14-19; 47: 3-9; 94: 3-8).[7] After Defendant continued to deny involvement in the burglaries, Special Agent Kovach asked Defendant, "[W]ell, if you're not involved, would you mind if we take a look around your house[?]"[8] (Id. at 8: 21-24.) In response, Defendant said, "[N]o."[9] (Id. at 9: 1.) Special Agent Kovach then told Defendant that he could walk around with the ATF Agents while they searched the Home, if he wanted to do so. (Id. at 9: 1-2.)

At that point, Defendant led Special Agents Kovach and O'Donnell around the Home, walking a step or two in front of them.[10] (Id. at 9: 4; 49: 7-23.) Defendant and Special Agents Kovach and O'Donnell walked to the basement and the hallway where the bedrooms were located, and Defendant indicated which bedroom he shared with Ms. Parrish. (Id. at 9: 4-23.)

---

[7] Defendant testified that only Special Agent Markovchick remained in the living room with him. (Id. at 77: 21-25; 78: 1-23.) However, the Court credits the testimony of Special Agents Kovach, Markovchick, and Stewart that Special Agent Markovchick went to the kitchen with Ms. Parrish and Special Agent Stewart, and Special Agents Kovach and O'Donnell remained in the living room with Defendant. (Id. at 8: 14-19; 47: 3-9; 94: 3-8.)

[8] The ATF Agents did not have any copies of ATF Form 3220.11 with them when they arrived at the Home, and thus did not ask Defendant to sign any type of consent form. (Id. at 36: 20-25; 37: 1-24; 90: 2-10.)

[9] The Court notes that Defendant testified that none of the ATF Agents asked for his consent to search the Home, and that he never gave them his consent to search the Home. (Id. at 79: 1-4; 81: 23-25; 82: 1.) However, the Court credits the testimony of Special Agent Kovach, which indicates that Defendant did give his consent to search the home by responding, "No," when Special Agent Kovach asked him whether he minded if the ATF Agents "[took] a look around" the Home.

[10] The testimony presented at the hearing conflicts as to whether Defendant walked around the Home with Special Agents Kovach and O'Donnell. Defendant and Ms. Parrish testified that Defendant never left the living room area once the ATF Agents arrived at the home (id. at 60: 9-20; 80: 1-2), while the testimony of Special Agents Stewart, Kovach, and Markovchick indicates that Defendant did lead Special Agents Kovach and O'Donnell around the Home (id. at 30: 21-25; 49: 7-13; 95: 17-25). As to this point, the Court credits the testimony of Special Agents Stewart, Kovach, and Markovchick.

6

Eventually, Special Agent Kovach returned with Defendant to the living room area, while Special Agent O'Donnell proceeded to search the bedroom shared by Defendant and Ms. Parrish. (Id. at 10: 7-11.) Upon returning to the living room, Defendant sat back on the couch without being prompted to do so by any of the ATF Agents. (Id. at 32: 16-24.) After Special Agent O'Donnell returned to the living room, Special Agent Markovchick also returned to the living room, and Special Agent Kovach went to the bedroom shared by Defendant and Ms. Parrish.[11] (Id. at 10: 9-23; 36: 2-6; 39: 16-22.) Special Agents Markovchick and O'Donnell remained with Defendant (id. at 36: 3-4; 43: 5-7), and discussed where Defendant had been on the night of the burglaries, as well as the benefits of Defendant coming forward early if he was involved with the burglaries (id. at 50: 17-25; 51: 11-20).

In the bedroom, Special Agent Kovach searched an open laundry basket of dirty clothing. (Id. at 11: 12-13; 38: 10-14) He found a dark-colored balled-up sweatshirt, which he removed from the basket. (Id. at 11: 13-17; 52: 18-20.) Inside the balled-up sweatshirt, Special Agent Kovach found a gray hat and a pair of gloves. (Id. at 11: 15-17.) In Special Agent Kovach's opinion, these items were consistent with what someone committing a burglary would wear. (Id. at 14: 20-22.) He then returned to the living room with the sweatshirt, hat, and gloves, and placed them on the floor in front of Defendant. (Id. at 14: 4-6; 51: 1-4 80: 23-25.) At that point, Defendant, who had previously appeared calm, became upset and said, "You're not taking my sweatshirt."[12] (Id. at 14: 7-10, 51: 3-5.) In response, Special Agent Kovach told Defendant that

---

[11] Special Agent Kovach noted that even though Special Agent O'Donnell had just searched the bedroom, he decided to search it himself because Special Agent O'Donnell was less familiar with the investigation than Special Agent Kovach and did not know what kind of clothing the suspects in the surveillance footage were wearing. (Id. at 39: 16-22.)

[12] Defendant testified that he had felt that it was acceptable to tell the ATF Agents that they could not take the clothing, but that he had been confused about whether he could tell them that they could not search the Home earlier in the evening. (Id. at 86: 10-15.)

7

the ATF Agents were going to take the clothing because it constituted evidence and Defendant had consented to the search.[13] (Id. at 14: 12-13.) Special Agent Kovach also told Defendant that if he was lying as to his involvement in the burglaries, he could be arrested. (Id. at 33: 24-25; 34: 1-8.) At the end of this exchange, Defendant told the ATF Agents to leave the Home.[14] (Id. at 53: 13-14.) The ATF Agents left soon after, with the seized sweatshirt, hat, and gloves. (Id. at 51: 5-7; 53: 13-14.) The ATF Agents never arrested Defendant or read him his Miranda rights on the night of January 18, 2018. (Id. at 34: 9-10; 51: 21-23; 52: 7-8; 56: 12-15.)

### B. Procedural Background

On February 14, 2018, a federal grand jury returned a five-count indictment charging Defendant with: (1) conspiracy to burglarize a pharmacy in violation of 18 U.S.C. § 2118(d); (2) burglary of a pharmacy in violation of 21 U.S.C. § 2118(b); (3) conspiracy to possess stolen firearms in violation of 18 U.S.C. § 371; (4) possession of stolen firearms in violation of 18 U.S.C. § 922(j); and (5) possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). (Doc. No. 3.) On February 15, 2018, Defendant entered a plea of not guilty to all counts of the indictment. (Doc. No. 32.)

On May 8, 2018, Defendant filed a motion for suppression of physical evidence and statements pursuant to the Fourth Amendment to the United States Constitution (Doc. No. 55),

---

[13] Ms. Parrish also objected to the ATF Agents taking the articles of clothing, to which they responded that they were taking them because they were evidence. (Id. at 61: 25; 62: 1-5.)

[14] Defendant's testimony differed significantly from the testimony of Special Agents Kovach and Markovchick in regard to the interaction between Defendant and the ATF Agents when Special Agent Kovach showed the sweatshirt, hat, and gloves to Defendant in the living room. The testimony of Special Agents Kovach and Markovchick supports the version of events described above, and also indicates that the ATF Agents did not push Defendant onto the couch. (Id. at 34: 11-13.) Defendant testified that he denied that the clothing belonged to him, that Special Agent Markovchick pushed him when he stood up from the couch, and that he never asked the ATF Agents to leave the Home. (Id. at 80: 23-25; 81: 1-13; 85: 17-24.) As to these points, the Court credits the testimony of Special Agents Kovach and Markovchick.

along with a brief in support thereof (Doc. No. 56). On May 22, 2018, the Government filed a brief in opposition to Defendant's motion. (Doc. No. 60.) Because the applicable time period for filing a reply brief has passed, Defendant's motion is ripe for disposition.

## II. LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects the public against "unreasonable searches and seizures." U.S. CONST. amend. IV. Evidence obtained due to an illegal search or seizure is deemed "fruit of the poisonous tree" and must be excluded. Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). Generally, a "warrantless entry into a person's house is unreasonable per se." See Payton v. New York, 445 U.S. 573, 586 (1980). However, several exceptions to this rule exist. See Jones v. United States, 357 U.S. 493, 499 (1958). "Consent is an exception to the 'requirements of both a warrant and probable cause.'" United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). These safeguards, often referred to as Miranda warnings, require that prior to questioning a suspect be advised that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Alston v. Redman, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting Miranda, 384 U.S. at 479) (internal quotation marks omitted). Officers are required to provide Miranda warnings only when a suspect is both in custody and subject to interrogation. See United States v. Walker, 529 F. App'x 256, 265 (3d Cir. 2013) (citing Alston, 34 F.3d at 1246-47).

## III. DISCUSSION

### A. Defendant's Expectation of Privacy at the Home[15]

An individual lacking a reasonable expectation of privacy in a particular place cannot invoke the Fourth Amendment protections as to that place. See United States v. Perez, 280 F.3d 318, 337 (3d Cir. 2002) (citing Minnesota v. Carter, 525 U.S. 83, 88 (1998)). "A co-resident of a shared dwelling and an overnight guest of a dwelling are typically held to have a reasonable expectation of privacy in that dwelling." United States v. King, 364 F. App'x 781, 786 n.6 (3d Cir. 2010) (citing Minnesota v. Olson, 495 U.S. 91, 100 (1990); United States v. Villegas, 495 F.3d 761, 772 (7th Cir. 2007)). In determining whether an individual was an overnight guest entitled to an expectation of privacy, the Court can consider factors such as "whether and how often the person spent the night, whether the person had a key, whether the premises were habitable, and whether the person stored personal belongings or overnight accoutrements in the place." United States v. Coles, 264 F. Supp. 3d 667, 678 (M.D. Pa. 2017) (citing United States v. Edwards, No. 11-735, 2013 WL 2256125, at *10 (E.D. Pa. May 23, 2103); United States v. Henry, No. 11-30, 2012 WL 2886204, at *5-6 (D.V.I. July 15, 2012); United States v. Mitchell, No. 10-CR-11, 2010 WL 3938235, at *4 (M.D. Pa. Oct. 4, 2010)).

In the instant case, although Defendant did not have his own dresser drawer at the Home, he had his own laundry basket in which he kept his clothing. (Tr. at 73: 5-16.) In addition,

---

[15] Although neither party raised the issue of whether Defendant had an expectation of privacy at the Home (Doc. Nos. 56, 60), in light of the testimony provided at the suppression hearing, the Court addresses that question.

10

Defendant stayed at the Home whenever he was scheduled to work the next morning because of the Home's proximity to his workplace.  (Id. at 73: 10-17.)  Further, Defendant planned to stay overnight at the Home on the night of the search because he had work the following morning.  (Id. at 73: 10-21.)  Considering these facts, in light of the applicable legal standard articulated supra, the Court concludes that Defendant was an overnight guest at the Home and had a reasonable expectation of privacy for Fourth Amendment purposes.

### B. Defendant's Authority to Consent to a Search of the Home[16]

The Court next turns to the question of whether Defendant had authority to consent to a search of the Home.  "The individual giving consent [to search] must also possess the authority to do so."  United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)).  One who has common authority over a residence has the authority to consent to the search of that residence, even when another with whom that authority is shared is absent and has not consented to the search.  See United States v. Matlock, 415 U.S. 164, 170 (1973).  Whether an individual possesses common authority "rests not on property rights but 'rather on mutual use of the property by persons generally having joint access or control.'"  Stabile, 633 F.3d at 230 (quoting Matlock, 415 U.S. at 170).  This determination must be made such that "it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." [17]  Id. at 230-31 (quoting Matlock, 415 U.S. at

---

[16] Although neither party specifically addressed this issue (Doc. Nos. 56, 60), given the testimony at the suppression hearing, the Court finds that it is nonetheless pertinent to the determination of the validity of the search.

[17] Although status as an overnight guest is critical to the determination of expectation of privacy, the Court must examine whether a party exercised common authority over a space when determining whether he or she had the authority to consent to a search.  These analyses are not perfectly congruent.  The Court notes that the unique circumstances of this case present an

170). Even when a party lacks actual authority to consent to a search, the consent may still be valid under the doctrine of apparent authority. See United States v. Murray, 821 F.3d 386, 391-92 (3d Cir. 2016) (quoting Rodriguez, 497 U.S. at 179). "The apparent-authority doctrine excuses otherwise impermissible searches where the officers conducting the search 'reasonably (though erroneously) believe that the person who has consented' to the search had the authority to do so." United States v. Walker, 529 F. App'x 256, 264 (3d Cir. 2013) (quoting Rodriguez, 497 U.S. at 186; Bolden v. Se. Pa. Transp. Auth., 953 F.2d 807, 828 n.29 (3d Cir. 1991)).

---

interesting dilemma in that Defendant's status as an overnight guest creates a reasonable expectation of privacy and simultaneously calls into question his authority to consent to the ATF Agents' search of the Home. To the Court's knowledge, the existing precedent does not squarely address such a scenario. Nearly all cases in which the authority of an individual to consent to a search is questioned involve a third party consenting to a search. See, e.g., Rodriguez, 497 U.S. at 179-82; United States v. Sanchez, No. 3:15-cr-87, 2017 WL 1105139, at *11 (M.D. Pa. Mar. 24, 2017); United States v. Balanquet-Herrera, No. 14-cr-278, 2016 WL 164543, at *8 (W.D. Pa. Jan. 14, 2016); United States v. Johnson, No. 12-cr-291, 2012 WL 5354601, at *4 (E.D. Pa. Oct. 31, 2012); United States v. Long, No. 04-cr-159, 2005 WL 2807123, at *5-6 (W.D. Pa. Oct. 27, 2005); United States v. Atiyeh, No. 00-cr-682, 2001 WL 66409, at *8-11 (E.D. Pa. Jan. 22, 2001). Certain decisions in this circuit and others, however, have addressed a claim that the defendant lacked authority to consent to a search. When analyzing a defendant's claim that he lacked authority to consent to a search, the Eighth Circuit did not address the question squarely, but, rather, determined that the defendant's status as a co-occupant of the apartment provided both his standing to challenge the search and his authority to consent to a search. See United States v. Rogers, 661 F.3d 991, 993-94 (8th Cir. 2011). Similarly, this Court concluded that a defendant challenging his own authority to consent to a search had joint access to the property in question and thus had the authority to consent to its search, without addressing squarely whether such a challenge could ever be raised successfully. See United States v. Kellam, No. 1:14-cr-323, 2015 WL 6560637, at *6 (M.D. Pa. Oct. 29, 2015). On the other hand, a District of Oregon court concluded that if the defendant were able to establish that he had no authority to consent to a search, then he would not have standing to challenge the search as an initial matter. See United States v. Zamudio-Guzman, No. 99-cr-136-HA, 1999 WL 1279742, at *4 (D. Or. June 30, 1999). In the few federal court cases in which an alleged overnight guest defendant also allegedly consented to the search, courts appear to assume the authority of the overnight guest defendant to consent to a search without addressing the issue directly. See, e.g., United States v. Lewis, 608 F.3d 996, 998-1001 (7th Cir. 2010); United States v. Sallis, No. 17-cr-2017-LRR-1, 2017 WL 2819973, at *8-9 (N.D. Iowa June 29, 2017); United States v. Paulino, No. 12-cr-799(PA), 2013 WL 2237532, at *4-7 (S.D.N.Y. May 21, 2013). Given the lack of precedent allowing a defendant to challenge his own authority to consent to a search, the Court concludes that one may challenge the authority to consent to a search only when a third party, rather than the defendant himself, is alleged to have consented to the search.

Here, because Defendant, rather than a third party, allegedly consented to the search, a challenge to his authority to consent cannot succeed. Assuming <u>arguenedo</u> that a defendant may successfully challenge his own authority to consent to a search, the Court concludes that the search was valid in regard to Defendant's authority to provide such consent. The actual authority of Defendant to consent to a search of the Home is questionable. Here, the testimony given by Ms. Parrish indicates that Defendant did not have common authority over the Home or the bedroom in which he slept. Ms. Parrish did not permit Defendant to have his own drawer of clothing in the bedroom at the Home, although he was allowed to keep a laundry basket with his clothing in the bedroom. (Tr. at 73: 5-16.) She had also told Defendant, "Don't get too comfortable," in the context of storing his belongings in the bedroom. (<u>Id.</u> at 73: 11-12.) Such facts indicate that while Defendant was permitted to stay at the Home on at least some nights, his control over the Home was restricted by Ms. Parrish such that it did not reach the level of common authority.

However, even if Defendant did not have actual authority to consent to a search of the Home, the Court concludes that, under the circumstances of the search, the ATF Agents' belief that Defendant exercised authority and control over the Home was reasonable. Special Agent Stewart inquired about Defendant's address using both a PennDOT driver's license search and an Accurint search, both of which indicated that Defendant's address at the time was that of the Home. (<u>Id.</u> at 91: 1-23.) Additionally, when the ATF Agents arrived at the Home, Defendant answered the door and invited them inside. (<u>Id.</u> at 6: 23-25; 7: 1-2, 11-19; 28: 4-9; 41: 17-25; 47: 1-4.) Defendant later walked with Special Agents Kovach and O'Donnell to the different rooms in the Home and indicated which bedroom he shared with Ms. Parrish. (<u>Id.</u> at 9: 1-23.) Further, in that bedroom, Special Agent Kovach found a laundry basket of men's clothing, and there was

no indication that any other adult male resided at the Home. (Id. at 11: 11-17; 38: 10-25; 39: 1.) Under such circumstances, the Court finds that the ATF Agents' belief that Defendant had authority to consent to the search of the Home was reasonable. Accordingly, the Court concludes that the search was valid insofar as it pertains to the authority of Defendant to consent to the search.

### C. Validity of Defendant's Consent to Search the Home

The Court now turns to the issue of the validity of Defendant's consent to search. While warrantless searches are generally prohibited, "[i]t is well settled . . . that a search conducted pursuant to consent is one of the specifically established exceptions to the search warrant requirement." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) (citing Schneckloth, 412 U.S. at 219). However, for the consent to be valid, the Government must prove that the consent was given freely and voluntarily. See United States v. Price, 558 F.3d 270, 277-78 (3d Cir. 2009) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). Whether the consent was given freely and voluntarily is a question of fact determined by considering the totality of the circumstances. See United States v. Williams, 893 F.3d 323, 332 (3d Cir. 2018) (quoting United States v. Antoon, 933 F.2d 200, 203 (3d Cir. 1991)). The Third Circuit has emphasized that the critical factors to consider in a totality of the circumstances inquiry include: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." Id. (quoting Price, 558 F.3d at 278) (internal quotation marks omitted).

Defendant argues that he did not give his voluntary consent to the ATF Agents to enter or search the Home. (Doc. No. 56 at 3-4.) In response, the Government argues that Defendant provided valid consent to the ATF Agents to search the Home. (Doc. No. 60 at 7-8.) It contends

14

that there is no indication that Defendant's consent was "coerced or contrived," and that when considered in the totality of the circumstances, the search was permissible because Defendant voluntarily consented to it. (Id.)

Defendant was an adult at the time of the search (Doc. No. 100 at 3), and based on his testimony, appears to be of at least average intelligence. See, e.g., United States v. Watts, No. 14-cr-46-RGA, 2015 WL 1412697, at *2 (D. Del. Mar. 26, 2015) (assessing the defendant's apparent intelligence in its analysis of whether the defendant freely and voluntarily consented to a search). Further, the relevant facts demonstrate that Defendant voluntarily allowed the ATF Agents into the Home,[18] led them to the living room, and gave his consent to search the Home after speaking to them for only a few minutes. (Tr. at 6: 23-25; 7: 1-2, 11-19; 8: 3-9, 20-25; 9: 1; 28: 4-25; 29: 1-25; 30: 1-24; 41: 17-25; 46: 25; 47: 1-12.) Moreover, Defendant then led the ATF Agents around the home for part of the search. (Id. at 9: 1-23; 49: 7-23; 95: 17-25.) The Court notes that prior to Defendant granting the ATF Agents permission to search the Home, the conversation was not threatening or hostile, and Defendant consented to the search of the Home after Special Agent Kovach asked him for permission to do so only one time. (Id. at 8: 21-25; 9: 1-2; 30: 15-25.) Additionally, it bears noting that none of the ATF agents had their weapons drawn at any point during their interaction with Defendant on the night of the search. (Id. at 29: 15-25; 30: 1-3; 55: 4-7; 64: 2-6.) Although none of the ATF Agents advised Defendant of his right to refuse to consent to a search (id. at 31: 18-20), the Court finds that, despite Defendant's testimony that he was confused as to whether he could tell the ATF Agents that they could not search the Home (id. at 86: 13-14.), the fact that Defendant told the ATF agents that they had to

---

[18] To the extent that Defendant is challenging the validity of the ATF Agents' initial entry into the Home, the Court finds that the relevant testimony presented at the suppression hearing, including the testimony of Defendant (Tr. at 77: 10-16), indicates that Defendant freely invited the ATF Agents to enter the Home. Accordingly, the Court concludes that the ATF Agents' initial entry into the Home was valid.

15

leave and could not take the clothing with them after Special Agent Kovach showed it to him in the living room (id. at 50: 8-10; 86: 3-12), suggests Defendant's understanding that he had the right to refuse a search. Upon careful consideration of the totality of the circumstances, and mindful of the relevant factors the Court must consider, as explained supra, the Court concludes that Defendant freely and voluntarily consented to the search of the Home.

### D. Scope of Defendant's Consent to Search the Home

When an individual consents to a search, he "may 'delimit as he chooses the scope of the search to which he consents.'" See Williams, 898 F.3d at 329 (quoting Florida v. Jimeno, 500 U.S. 248, 252 (1991)). "A court is to measure the scope of a suspect's consent using an objective standard to determine what a reasonable person would have understood from the exchange between the officer and the defendant." United States v. Walker, 529 F. App'x 256, 263 (3d Cir. 2013) (citing Jimeno, 500 U.S. at 251). Additionally, once an individual has consented to a search, he may withdraw his consent. Williams, 898 F.3d at 329-30. Once a court establishes that a defendant has validly consented to a search, "it is [the defendant's] burden to demonstrate that he has withdrawn that consent by pointing to an act or statement that an objective viewer would understand as an expression of his desire to no longer be searched."[19] Id. at 331.

Here, Special Agent Kovach asked Defendant if he minded if the ATF agents looked around the Home, to which Defendant replied, "No." (Id. at 8: 22-25; 9: 1-2; 30: 17-25.) Special Agent Kovach's search request was broad, and Defendant's answer indicated consent without any caveat or limitation as to where the ATF agents could search in the Home. The

---

[19] Defendant does not specifically address the scope of the consent beyond arguing that Defendant never voluntarily consented to any search. (Doc. No. 56 at 3-4.) Likewise, the Government does not specifically address the scope of the consent in its brief, beyond arguing that Defendant validly consented to a search of the Home. (Doc. No. 60 at 8.)

Court thus concludes that Defendant's initial consent to search the home permitted the ATF Agents to search the entire Home until consent was withdrawn. Up to the point of the seizure of the clothing at issue, none of the relevant testimony suggests that Defendant withdrew his consent. Accordingly, the Court also concludes that up to Special Agent Kovach's seizure of the sweatshirt, hat, and gloves, Defendant did not withdraw his consent to search the Home.

### E.     Applicability of Miranda[20]

Miranda warnings are required only when a suspect is both in custody and subject to interrogation. See Walker, 529 F. App'x at 265 (citing Alston, 34 F.3d at 1246-47). To determine whether an individual who has not been arrested is in custody, the Court must determine "whether there is a 'restraint on freedom of movement of the degree associated with a formal arrest.'" See United States v. McNeil, 416 F. App'x 227, 228 (3d Cir. 2011) (quoting United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999)). The Third Circuit has identified five factors to consider when making such a determination:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006).

Upon consideration of these factors, the Court concludes that Defendant was not in custody at any point on the night of January 18, 2018. Special Agent Kovach told Defendant at the

---

[20] Although Defendant does not specifically raise a Fifth Amendment Miranda challenge in his motion (Doc. Nos. 55-56), because the Government has addressed the issue of Miranda warnings in its brief (Doc. No. 60), and certain testimony indicates that the ATF Agents never provided Miranda warnings to Defendant (Tr. at 34: 9-10; 51: 21-23; 56: 12-15.), the Court examines whether any of the statements made by Defendant to the ATF agents on the night of January 18, 2018 must be suppressed under Miranda, 384 U.S. at 444. The Government argues that because Defendant was never in custody on the night of January 18, 2018, Miranda is inapplicable to the statements he made to the ATF Agents on that night. (Doc. No. 60 at 6-7.)

17

beginning of their interaction that he was not under arrest. (Tr. at 31: 21-24.) Further, that Defendant told the ATF agents to leave the Home after they showed him the seized clothing (Id. at 51: 4-7; 53: 13-14), suggests that Defendant understood that he could have told them to leave at any other point during the interaction that night. In addition, the ATF Agents were at the Home for approximately 30 minutes in total, a relatively short period of time. (Id. at 50: 8-13.) The testimony of the Special Agent Kovach indicates that there were periods of time during those 30 minutes, such as when Defendant was leading Special Agents Kovach and O'Donnell around the Home, that the ATF Agents were not asking Defendant questions. (Id. at 9: 1-23.) Additionally, the ATF Agents did not draw their weapons at any point (id. at 55: 4-7; 63: 24-25; 64: 1-6), and none of the testimony indicates that the tone of the conversation between Defendant and the ATF Agents was intense or heated, apart from when Defendant himself became heated when he told the ATF agents that they could not seize the clothing (id. at 14: 3-13; 51: 1-7). The fact that Defendant invited the ATF Agents into the Home and sat down in the living room to speak with them (id. at 6: 25; 7: 1-2, 11-12; 8: 1-3; 46: 25; 47: 1-12.), indicates that Defendant voluntarily submitted to questioning. Accordingly, as the Court has determined that Defendant was not in custody when he made any statements on January 18, 2018, the Court concludes that Miranda does not apply, and the statements made by Defendant on the night of January 18, 2018 will not be suppressed.

## IV.     CONCLUSION

Accordingly, for the reasons stated above, the Court will deny Defendant's motion for suppression of physical evidence and statements. (Doc. No. 55.) An Order consistent with this Memorandum follows.